# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>vs.<br><br>JEREMY RAY HALL,<br><br>       Defendant. | No. CR 05-0066-LRR<br><br><br><br>**ORDER** |

_____

**TABLE OF CONTENTS**

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*   *FACTUAL FINDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*  *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*IV.*  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*V.*   *OBJECTIONS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     *A. Defendant's Objections to the Findings of Fact* . . . . . . . . . . . . . . . . 7

     *B. Defendant's Objections to the Conclusions of Law* . . . . . . . . . . . . . . 9

         *1. Inventory Searches* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*VI.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## I. INTRODUCTION

Before the court is Defendant Jeremy Ray Hall's Substituted and Amended Objections (docket no. 30) to the Report and Recommendation (docket no. 24) denying Defendant's Motion to Suppress (docket no. 19). Defendant contends the police searched his car without a warrant in violation of the Fourth Amendment. Because the search was a lawful inventory search, the court overrules Defendant's Objections, adopts the Report and Recommendation, and denies the Motion to Suppress.

## II. FACTUAL FINDINGS

After *de novo* review of the record, the court finds the following facts:

At approximately 1:30 a.m. on August 18, 2003, the Cedar Rapids Police Department ("CRPD") received a call about a possible sexual assault victim at St. Luke's Hospital ("Hospital"). Officer Nguyen went to the Hospital and interviewed the alleged victim. The alleged victim told Officer Nguyen that Defendant and another man had sexually assaulted her, were potentially involved in the manufacture of methamphetamine and had outstanding warrants. She also told police that the Defendant had sold her methamphetamine, was believed to be manufacturing methamphetamine "out in the woods," had washed methamphetamine manufacturing paraphernalia in her home and might have items associated with the manufacture of methamphetamine in his car.

Around 2:30 a.m., the Hospital called the CRPD to alert officers that suspects in the alleged sexual assault were in the Hospital. Officer Estling was dispatched to the Hospital. Officer Estling met three men as they were exiting the emergency room door. Officer Estling stopped them and asked for identification. Defendant initially provided Officer Estling a false name. After Defendant gave his real name, Officer Estling discovered Defendant had an outstanding warrant. Defendant was placed under arrest.

The police asked Defendant for permission to search his car, which was parked on

the first floor of the Hospital's private parking ramp. Defendant refused. Defendant did not ask anyone to move his car from the ramp. No one volunteered to drive the car for him.[1] Defendant was taken to the police station.

Meanwhile, Officer Estling's partner, Officer Herbert, found Defendant's car and stood watch over it. A sign at the parking ramp indicated that it was a private parking ramp for the use of the Hospital's patients and guests.

Later that morning, Officer Kasper relieved Officer Herbert. Officer Kasper did not know Defendant had been arrested. Officer Kasper testified that, although he knew Defendant was at the police station and that there was a warrant out for his arrest, he had no contact with Defendant, did not know if the warrant had been confirmed, and could not conclude Defendant was under arrest simply because he was at the police station.

While Officer Kasper was watching Defendant's car, Hospital security guards approached him. The security guards asked Officer Kasper why he was standing in their parking lot. Officer Kasper told the security guards that "there was possibly a meth lab involved with this vehicle," "the owner of the vehicle was currently not around" and the owner "appeared to have left the vehicle in their hospital ramp."

The Hospital asked Officer Kasper to have Defendant's car towed from its private parking lot. The CRPD has a written policy about towing vehicles from private property at the request of the property owner. A CRPD order states:

> Vehicles towed from private property upon the property owner's request requires the following:
>
> 1. The lot must be posted with proper signs at each

---

[1] It is unclear whether either of the two men with Defendant had a valid driver's license; when asked for identification, one of the men presented the officers a non-driver identification card.

>    entrance or posted so signs can be seen from anywhere in the lot stating "Private Property - Unauthorized Vehicles Will Be Towed." (Signs must have been posted for at least 24 hours before we will enforce.)
>
> 2. A Vehicle Removal or Impounding Report . . . will be filled out with the property owner or person in charge filling out and signing Part 2.
>
> 3. <u>A parking ticket will be issued.</u>
>
> 4. A wrecker from the towing company which has the city contract will be used to tow this vehicle.

(Emphasis in original.) Officer Kasper followed this procedure. Officer Kasper issued a parking ticket, called the towing company on contract with the city and requested a tow.

Officer Kasper decided to have Defendant's car stored in the towing company's private lot, not impounded at the police station. CRPD policy grants officers discretion to impound vehicles under various circumstances, but a private property tow is not one of them.

Regardless of whether a vehicle is towed to a private lot or impounded, CRPD policy requires officers to conduct a complete inventory search. CRPD policy states inventory searches will be conducted on all vehicles before they are "towed, removed, or impounded." The policy states:

> [A]ny officer causing a vehicle to be towed . . . will inventory the contents and record the inventory in the appropriate space on the VEHICLE REMOVAL OR IMPOUNDING REPORT.

(Emphasis in original.) The policy further states that "[a] complete inventory, to include the trunk, will be taken when the keys are available." The inventory is designed to protect the police department from liability, the owner against loss of valuable contents and the

towing company and officers from dangerous items inside the vehicle.

Around 6:00 a.m., Officer Kasper began an inventory search of Defendant's car, including the trunk, in accordance with the CRPD's written policy. Officer Kasper had the keys to Defendant's car, although it is unclear how he acquired them.

Officer Kasper surveyed the car's exterior for property damage and examined the interior of the car. In the trunk of the car, Officer Kasper found methamphetamine precursors. Officer Kasper called the CRPD and requested backup from the Detective Bureau.

Detective Robinson arrived and helped Officer Kasper complete the inventory search of Defendant's car. In the trunk, the officers found numerous items and closed containers, including two duffel bags and at least one tied plastic grocery bag. The plastic grocery bag was partially "translucent"; Detective Robinson could see boxes of blister packs of pseudoephedrine tablets in the bag without opening it. The officers opened the closed containers, which were not locked. In total, the officers found a number of items associated with the manufacture of methamphetamine, a shotgun, and several broken-down pieces of firearms. Officer Kasper completed the CRPD's "Vehicle Removal or Impounding Report," memorializing what they found.

### *III. PRIOR PROCEEDINGS*

On July 27, 2005, Defendant was charged in a four-count Indictment. Count 1 charges Defendant with manufacturing or attempting to manufacture five or more grams of actual (pure) methamphetamine after having been previously convicted of a felony drug offense. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, 851. Count 2 charges Defendant with possession of approximately 67.7 grams of pseudoephedrine with the intent to manufacture methamphetamine. *See* 21 U.S.C. § 841(c)(1). Count 3 charges Defendant with possession of a firearm after having been previously convicted of one or

5

more crimes punishable by imprisonment for a term exceeding one year. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). Count 4 charges Defendant with possession of a firearm while being an unlawful user of a controlled substance. *See* 18 U.S.C. §§ 922(g)(3), 924(a)(2).

On August 29, 2005, Defendant filed a Motion to Suppress (the "Motion"). On September 2, 2005, the government filed a Resistance to the Motion. On September 6, 2005, Chief Magistrate Judge John A. Jarvey held an evidentiary hearing on Defendant's Motion. Defendant was personally present and represented by counsel, David Nadler. Assistant United States Attorney Stephanie Rose represented the government. On September 8, 2005, Judge Jarvey filed a Report and Recommendation in which he recommended the court deny the Motion. *See United States v. Hall*, No. CR-05-0066, 2005 WL 2177188 (N.D. Iowa Sept. 8, 2005). On September 13, 2005, Defendant filed Objections to the Report and Recommendation. On September 26, 2005, Defendant filed Substituted and Amended Objections to the Report and Recommendation ("Objections").

### *IV. PRINCIPLES OF REVIEW*

The district court judge is required to make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which a movant objects. 28 U.S.C. § 636(b)(1)(C); *see also United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003). The district court judge may accept, reject or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); *see also United States v. Trice*, 864 F.2d 1421, 1424 (8th Cir. 1988). Defendant has made specific, timely objections to the Report and Recommendation. Therefore, *de novo* review of "those portions of the report or specified proposed findings or recommendations to which objection is made" is required. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b) (providing for review of a magistrate judge's report and recommendation on dispositive motions).

## V. OBJECTIONS

Defendant lodges a number of objections to the Report and Recommendation. The court finds that many of the "objections" are commentary on the CRPD's policies, not objections to the Report and Recommendation. In what follows, the court, to the extent possible, reformulates Defendant's commentary as specific objections. The court first considers Defendant's factual objections to the Report and Recommendation, then his legal objections.[2]

### A. *Defendant's Objections to the Findings of Fact*

Defendant objects to Judge Jarvey's findings of fact on ostensibly twelve grounds:

First, Defendant claims the Report and Recommendation incorrectly states Defendant's car was parked in the "parkade" of the Hospital. Defendant maintains his car was parked on the first floor of the ramp at the Hospital. The specific testimony was that the car was parked on the first floor of the ramp at the Hospital. The court finds that the use of the term "parkade" is not an incorrect characterization. In any event, any discrepancy is irrelevant to the substance of Defendant's Motion. The court overrules Defendant's first objection.

Second, Defendant objects to the factual finding that his car "was secured because of the reports that it may have contained items associated with the manufacture of methamphetamine." Defendant contends "[i]n fact, narcotics officers were called to the scene because of suspicions of methamphetamine involvement." As a threshold matter, the court questions whether there is any difference between these two statements. In any event, the court finds that the language in the Report and Recommendation was accurate. Officer Nguyen testified that the alleged victim had informed the CRPD that Defendant

---

[2] The court does not present the objections in the same order as Defendant.

might have items associated with the manufacture of methamphetamine in his car, which was parked at the Hospital. Officer Estling testified that, while he placed Defendant under arrest and transported him to the police department, his partner, Officer Herbert, secured Defendant's unoccupied car. Officer Herbert ensured that no one entered or approached Defendant's car. Officer Kasper relieved Officer Herbert. When the Hospital's security guards questioned Officer Kasper, he explained that he had secured Defendant's car because "there was possibly a meth lab involved with [the] vehicle." The court therefore overrules Defendant's second objection.

Third, Defendant objects to the factual findings that (1) neither of the two men who had accompanied him to the Hospital offered to move his car and (2) Defendant did not ask anyone else to drive his car. Defendant asserts that (1) he was not asked if he wanted someone else to take possession of his car and (2) at least one of the two men who had accompanied him could have moved his car. Defendant's objections are misplaced, irrelevant and lack support in the record. Defendant's objections are misplaced because Defendant's own assertions, even if true, do not contradict the factual findings in the Report and Recommendation. That is, it could be true that neither of the two men with Defendant offered to move his car and Defendant was not asked if he wanted someone else to take possession of his car; likewise, it could be true that Defendant did not ask anyone to drive his car and one of the two men with Defendant could have moved his car. Defendant's objections are irrelevant because CRPD policy does not require officers to ask a vehicle owner if he wants his vehicle released to another licensed driver. Defendant's objections lack evidentiary support in the record because neither man produced a valid driver's license to law enforcement officers or offered to move Defendant's car. Defendant's objections to these factual findings are overruled.

Fourth, Defendant claims that Officer Kasper knew at the time of the inventory

search that Defendant had been arrested. To the contrary, Officer Kasper testified that he did not know that Defendant was under arrest. The court finds Officer Kasper's testimony credible. Officer Kasper explained that he knew Defendant was at the police station being questioned and that Defendant had an outstanding warrant, but was not aware that Defendant had been arrested. No evidence was presented to show that Officer Kasper in fact knew that Defendant had been arrested and was not merely being questioned. Defendant's objection to this factual finding is overruled.

Fifth, Defendant objects to the factual finding that Officer Kasper issued a parking ticket for Defendant's car. Defendant claims Officer Kasper did not issue a parking ticket for Defendant's car. During the Hearing, Officer Kasper testified that he remembered issuing a parking ticket for Defendant's car but acknowledged that he had no record of the parking ticket. The court finds Officer Kasper's testimony credible. Therefore, Defendant's objection to this factual finding is overruled.

In his remaining objections, Defendant variously asserts that the CRPD policy gave Officer Kasper too much discretion in conducting the inventory search or that Officer Kasper abused the discretion the policy afforded him. These are not objections to the findings of fact in the Report and Recommendation, but objections to the conclusions of law. The court addresses them as such in the next section of this Order.

### *B. Defendant's Objections to the Conclusions of Law*

Before addressing Defendant's objections to the conclusions of law, a brief summary of Supreme Court precedent concerning inventory searches will prove helpful.

### *1. Inventory Searches*

The government concedes it did not have a warrant when police searched Defendant's car. Generally, warrantless searches are *per se* unreasonable under the Fourth Amendment. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). In order for the government

9

to introduce evidence obtained during a warrantless search, it bears the burden to show: (1) there is an applicable exception to the warrant requirement and (2) the government's conduct fell within the bounds of the applicable exception. *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993). The government claims the warrantless search conducted in this case was an inventory search. *See, e.g., Colorado v. Bertine,* 479 U.S. 367 (1987) (recognizing the inventory search as an exception to the Fourth Amendment's prohibition against warrantless searches); *Illinois v. Lafayette*, 462 U.S. 640 (1983) (same); *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976) (same).

*Bertine* is instructive. In *Bertine*, police arrested a man for drunk driving. *Bertine*, 479 U.S. at 368. After Bertine was taken into custody, police inventoried the van's contents at the scene. *Id.* at 368-69. Inside the van, the police found a backpack. *Id.* at 369. Acting in accordance with local standardized procedures, the police opened the backpack. *Id.* In the backpack, they found a nylon bag with closed canisters in it. *Id.* The police opened the canisters and found cocaine, cocaine paraphernalia, and a large amount of cash. *Id.* The van was towed and impounded. *Id.*

Bertine was charged with, *inter alia*, unlawful possession of cocaine with intent to deliver. *Id.* Bertine filed a motion to suppress, in which he argued the search of the closed backpack and the closed canisters inside it violated the Fourth Amendment. *Id.*

The Supreme Court upheld the search. The Court reiterated that the inventory search is "a well-defined exception to the warrant requirement of the Fourth Amendment." *Id.* at 371 (citations omitted). The Court noted that the policies underlying the warrant requirement and probable cause are not implicated in an inventory search. *Id.* A standardized inventory search is a routine, non-criminal "'administrative caretaking function[], particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.'" *Id.* (quoting *Opperman*, 428 U.S. at 370 n.5).

Inventory searches "serve to protect an owner's property while it is the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372. In light of these "strong governmental interests," the Court afforded "deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody." *Id.* Because the police were following standardized procedures and there was no showing the police "acted in bad faith or for the sole purpose of investigation," the court upheld the search. *Id.* at 372-73.

### 2. *Analysis*

In his Report and Recommendation, Judge Jarvey found the CRPD's private property tow policy was "a reasonable, standardized policy that does not give undue or excessive discretion to officers." *Hall*, 2005 WL 2177188, *4. Defendant challenges this legal conclusion in a number of respects. The gist of Defendant's arguments is that the CRPD's policy leaves too much discretion in the hands of investigating officers for it to be considered a "standardized policy." Defendant contends Officer Kasper used the procedure illegally as "a ruse for a general rummaging in order to discover incriminating evidence." *See Florida v. Wells*, 495 U.S. 1, 4 (1990) (reversing district court's denial of motion to suppress because police did not have a standardized policy); *see also Bertine*, 479 U.S. at 376 (Blackmun, J., concurring) (pointing out that *Bertine* should not be construed to permit inventory searches to become "a purposeful and general means of discovering evidence of crime").

As explained in the court's finding of facts, the CRPD had a written policy mandating inventory searches of vehicles subject to private property tows, and Officer Kasper complied with that policy in all respects. Officers may use their judgment in conducting a inventory search and need not act in a "totally mechanical 'all or nothing' fashion," so long as they comply with a standardized policy. *Wells*, 495 U.S. at 4. In

11

truth, however, in the case at bar CRPD policy afforded Officer Kasper no discretion: once the tow was ordered, the policy stated the officer "will inventory the contents." Furthermore, because Officer Kasper had the keys to Defendant's car, the policy required him to search the trunk. The policy stated that if the keys were available, "[a] complete inventory, to include the trunk, will be taken." Defendant's reliance on *Wells*' "general rummaging" language is misplaced, because in *Wells* the police "had no policy whatever with respect to the opening of closed containers encountered during an inventory search." *Wells*, 495 U.S. at 4-5. Officer Kasper testified about the reasons for the policy, which were the same as those the Supreme Court discussed in *Bertine*: to protect the owner's property while it is in police custody, to insure against claims of lost, stolen, or damaged property, and to protect the police from danger. *See Bertine*, 479 U.S. at 372; *accord United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001) (similar).

Defendant contends, however, that the CRPD's policy does not *specifically* mandate that officers open "closed containers." *See Wells*, 495 U.S. at 4-5 (noting "there was no policy whatever *with respect to the opening of closed containers* encountered during an inventory search" (emphasis added)). In contrast, in *Bertine* the procedures in question "mandated the opening of closed containers and the listing of their contents." *Bertine*, 479 U.S. at 374 n.6.

Defendant's argument is unavailing. As indicated, CRPD policy states the inventorying officer "will inventory *the contents* and record the inventory . . . . (Emphasis added.). When the keys are available, the policy states "*[a] complete inventory*, to include the trunk, will be taken when the keys are available." (Emphasis added.). Although the policy does not specifically mention "closed containers," its plain language directs officers to make a complete inventory of all contents of the car—regardless of whether they are in a closed container. Courts have held post-*Wells* that a written policy that requires officers

12

to inventory "the contents" of a vehicle includes a directive to open closed containers; the fact the policy does "not use the buzz words 'closed container'" is not fatal. *See, e.g., United States v. Wilson*, 938 F.2d 785, 789 (7th Cir. 1991); *see also United States v. Richardson*, 121 F.3d 1051, 1055-56 (7th Cir. 1997) (adhering to *Wilson*). *But see State v. Hathman*, 604 N.E.2d 743, 746 (Ohio 1992) ("[T]he existence of a reasonable policy or procedure governing inventory searches in general is insufficient to justify the opening of closed containers encountered during the inventory search. Rather, some articulated policy must also exist which regulates the opening of containers found during the authorized inventory search.")

Even if the language of the policy were insufficiently specific on its face, the court finds that testimony makes it clear that it was the standard policy of the police department to open all closed containers during an inventory search, so long as the closed containers were accessible and not locked. *See United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004) ("[T]estimony can be sufficient to establish police procedures.") (citing *United States v. Lowe*, 9 F.3d 43, 46 (8th Cir. 1993)). It is well settled that testimony of an established routine may constitute part of a standardized inventory search. *See id.*; *see also Wells,* 495 U.S. at 4 (holding that "standardized criteria *or established routine* must regulate the opening of containers found during inventory searches" (emphasis added, citations omitted)); *accord Bertine*, 479 U.S. at 375-76 (holding the key factor is whether the search was "exercised according to standard criteria and on the basis of something other than suspicion of criminal activity"). On cross-examination, the following exchange took place between defense counsel and Officer Kasper:

> DEFENSE COUNSEL: What's the policy of the Cedar Rapids Police Department with regard to secured containers or closed containers?
> OFFICER KASPER: We inventory those items if they're

> readily open, we are able to open them; otherwise if they're secure, most of the time we note the item as being secure, unable to be accessed, and inventory it as such.
> DEFENSE COUNSEL: And where does it say in the towing policy that you can open closed containers?
> OFFICER KASPER: I don't know that it does.
> DEFENSE COUNSEL: Is that something that's within your discretion?
> OFFICER KASPER: That's something I do to be complete when I can.
> DEFENSE COUNSEL: And since you don't know whether the towing policy allows for that, you use your discretion in deciding whether to open closed containers?
> OFFICER KASPER: If it's a closed container that isn't locked, I open it.
> DEFENSE COUNSEL: That's your choice?
> OFFICER KASPER: Yes.

In light of the broad language of the written policy and Officer Kasper's testimony, the court finds that it was the policy of the CRPD to make a complete inventory of the contents of vehicles subject to private property tows. That meant officers would open everything they could open to effect a "complete inventory" of the "contents" of the vehicle; it was the established routine of the CRPD to not open closed containers only when the closed containers were unable to be opened, that is, secure or locked. *Cf. United States v. Duong*, 336 F. Supp. 2d 967, 974 (D.N.D. 2004) (relying upon officer's testimony that officer's required "detailed inspection" regularly "include[d] the opening of all containers he encounter[ed] in order to generate an inventory"). The court concludes that this standardized inventory policy was followed in the case at bar. *Cf. id.*

Critically, there is no showing law enforcement officers chose to open Defendant's duffel bags and plastic bags in bad faith, for the sole purpose of investigation or as a purposeful and general means of discovering evidence of crime. *See Bertine*, 479 U.S.

373-74; *see also id.* at 376 (Blackmun, J., concurring). The fact that the inventory sheet Officer Kasper filled out included the lawful contents of the car, not just the incriminating contents, buttresses the conclusion that Officer Kasper acted in good faith. *Cf. United States v. Rowland*, 341 F.3d 774, 781 (noting officer's failure to record lawful property as well as unlawful property "illustrate[d] the inventory search was pretextual"), *cert. denied*, 540 U.S. 1093 (2003).

Defendant makes four other specific legal objections to the Report and Recommendation. First, Defendant asserts that "there are considerably more requirements under the CRPD Policy when the vehicle is *not* impounded." (Emphasis added.) After reviewing the CRPD's policy, the court assumes that Defendant means that there are additional requirements when a vehicle *is* impounded and Officer Kasper was attempting to circumvent those requirements. The policy states:

> Officers should ask the driver of any vehicle being impounded for any reason, if they have valuables in any secured containers in the vehicle, so that the container may be taken for safe keeping until the owner can claim the items. The officer should request permission to open the container in the driver's presence, to verify the claim of value. If the driver refuses, the container should be removed to the police department for safekeeping and noted in the officer's report.

Although this provision does impose additional requirements, by its terms it only applies if the vehicle is impounded. Defendant's car was not impounded. Defendant's arguments about "secured containers" and the subsequent discussion at the hearing and in the Report and Recommendation are thus irrelevant to this case, which involved a private property tow.[3] Moreover, the court finds that Officer Kasper was not attempting to circumvent the

---

[3] As an aside, the court notes that the Report and Recommendation erroneously
(continued...)

15

additional requirements when he decided to have Defendant's car towed to another location instead of impounding it; as the court explained, there is no evidence police acted in bad faith and the Officer Kasper had legitimate reasons for treating the tow as a private property tow. Accordingly, Defendant's objection is overruled.

Second, Defendant claims that Officer Kasper should have obtained a search warrant before inventorying the items in the trunk of Defendant's car. Defendant points to CRPD policy, which provides:

> [W]hen an officer makes an inventory in accordance with procedures outlined in 1. and 2. above, and then finds it necessary to obtain a search warrant, any additional items found will be recorded on a separate sheet and attached to the record room copy of the Vehicle Removal or Impounding Report containing the initial vehicle inventory.

Procedures "1." and "2." only apply when officers do not have keys to the vehicle. Officer Kasper testified he had the keys to Defendant's car. The court finds that nothing in the CRPD's policy requires officers to obtain a warrant when they have the keys to the car. Accordingly, Defendant's objection is overruled.

Third, Defendant contends that the CRPD's policy as a whole afforded police too much discretion because Officer Kasper, in fact, had the choice to treat the inventory as an inventory subject to in-custody arrest or as a private property tow.[4] Although Officer

---

[3](...continued)
refers to "secured containers" as "sealed containers."

[4] CRPD has a different policy for towing a vehicle following an in-custody arrest. It provides:

> Vehicles towed incident to in custody arrests require a
                                                                (continued...)

16

Kasper, under the circumstances of this case, had the discretion to tow Defendant's car pursuant to either an arrest or a request to remove it from private property, the fact that he had this discretion did not in any way infringe on the protections the CRPD's policy afforded Defendant.

> It is well established that the police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity. In other words, as long as impoundment pursuant to the community caretaking or public safety function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking or public safety motives will not invalidate the search.

*United States v. Wallace*, 102 F.3d 346, 348 (8th Cir. 1996) (citations, alterations, and internal quotation marks omitted); *see also United States v. Frank*, 864 F.2d 992, 1001 (3d Cir. 1988) (holding mere fact detective in charge of inventory search was also in charge of investigating defendant for a crime did not invalidate the inventory search) (citing

---

[4](...continued)
    VEHICLE REMOVAL OR IMPOUNDING REPORT (CRPD #328) and <u>a 600 report.</u>

    1.    A vehicle shall be towed in connection with an in custody arrest. The only exceptions are that the vehicle may be released to another sober, licensed operator in the vehicle at the time of the arrest if the driver/owner so requests, or with commanders [sic] approval. This should be noted in the officer's report and a wrecker request (CRPD 325) should be filled out if released.

(Emphasis in original.)

*United States v. Orosco*, 715 F.2d 158, 161 (5th Cir. 1983) and *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982)). That is, the mere fact Defendant happened to be under arrest at the same time his car was left unattended on private property did not invalidate the search. Officer Kasper followed procedure, and so the search is valid.[5]

Lastly, Defendant contends Officer Kasper did not comply with CRPD policy because he failed to properly fill out the "Vehicle Removal or Impounding Report." Defendant maintains the policy required Officer Kasper to fill out a "statement surrounding abandonment" and obtain a signature from a tow company representative. It is unclear how any non-compliance over these minor matters would affect the standardized nature of the search. In any event, the court finds the form and the policy did not require Officer Kasper to obtain such a statement or signature; the form and the policy contemplated that both items might be completed by other persons. By its terms, the policy did not require Officer Kasper to fill out a "statement surrounding abandonment"; moreover, the form makes clear this line was to be filled out by the private property owner seeking a tow if the car were abandoned. Defendant's car was illegally parked, not abandoned. Nor does the policy require Officer Kasper to obtain the tow company employee's signature. This line was only to be signed when "[a]ll expenses and fees" for the tow were "taken care of to [the tow company's] satisfaction." The terms of the policy did not require Officer Kasper to obtain such a signature at the time of the search. As Officer Kasper testified, he acted

---

[5] The court also notes that even if Officer Kasper had treated the inventory search as one pursuant to an in-custody arrest, according to the standard policy of the CRPD, Defendant's car still would have been inventoried unless Defendant had requested that a licensed driver in the car at the time of his arrest drive the car. There is no evidence anyone was in Defendant's car at the time of his arrest. Moreover, Defendant did not make such a request and there is no evidence any of the other drivers were licensed.

in accordance with custom; logically, the tow company would not sign the form until the Defendant paid for the tow, which was typically after the inventory search was completed.

Because law enforcement officers followed standard police procedure when they conducted an inventory search of Defendant's car, they did not violate the Fourth Amendment. Accordingly, the court overrules Defendant's Substituted and Amended Objections, adopts the Report and Recommendation, and denies Defendant's Motion to Suppress.

## *VI. CONCLUSION*

For the foregoing reasons, **IT IS HEREBY ORDERED**:

(1) The court **OVERRULES** Defendant Jeremy Hall's Substituted and Amended Objections (docket no. 30);

(2) The court **ADOPTS** Judge Jarvey's Report and Recommendation (docket no. 24);

(3) The court **DENIES** Defendant Jeremy Hall's Motion to Suppress (docket no. 19);

and

(4) The period between the filing of Defendant's Objections and the filing of this Order is excluded from calculation under the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(F) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon); 18 U.S.C. § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").

**SO ORDERED.**

**DATED** this 13th day of October, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA